# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

MANUEL LOPEZ, ET AL.,           )
                                )
                Plaintiffs,     )
vs.                             )           NO.  CIV-15-1040-HE
                                )
THE QUIKRETE COMPANIES, INC.,   )
                                )
                Defendant.      )

## ORDER

Plaintiffs Manual Lopez and Agustin Arriaga filed this action in state court against their former employer, The Quikrete Companies, Inc. ("Quikrete"),[1] alleging Quikrete terminated them because they are Hispanic.[2] In addition to asserting national origin discriminatory discharge claims under Title VII of the Civil Rights Act of 1964 and the Oklahoma Anti-Discrimination Act ("OADA"), plaintiffs claimed Quikrete wrongfully discharged them in violation of Oklahoma public policy and negligently hired, supervised and trained its management employees. Quikrete removed the action and filed a motion for

---

[1]*Page references to briefs and exhibits are to the CM/ECF document and page number.*

[2]*In both their complaint and their summary judgment response, plaintiffs allege defendant discriminated against them on the basis of their race. However, as defendants point out, in the charges plaintiffs filed with the Equal Employment Opportunity Commission, they only claimed national original discrimination. See Doc. #48-5. The court therefore lacks jurisdiction to consider any race discrimination claims. See* Shikles v. Sprint/United Management Co.,*426 F.3d 1304, 1317 (10th Cir. 2005) (exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII in this circuit). It does not matter, though, because the analysis is the same for both national origin and race discrimination claims and the court concludes plaintiffs have not produced sufficient evidence of discrimination to submit their claims of discriminatory discharge under Title VII or the OADA to a jury. To avoid confusion, defendant refers to "Plaintiffs' potential race and national origins (El Salvador for Lopez and Mexico for Arriaga) as Hispanic." Doc. #71, p. 17. The court will do the same.*

partial judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). The court granted the motion as to plaintiffs' <u>Burk</u> or public policy tort and negligent supervision claims, leaving their discrimination claims under Title VII and the OADA for resolution.[3] Defendant has now moved for summary judgment, which is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A genuine dispute as to a material fact 'exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" <u>Carter v. Pathfinder Energy Servs., Inc.</u>, 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting <u>Zwygart v. Bd. of Cnty. Comm'rs</u>, 483 F.3d 1086, 1090 (10th Cir.2007)). Having considered the submissions of the parties in light of this standard, the court concludes Quikrete's motion should be granted.

<u>Background</u>[4]

James Hodges, who was plaintiffs' supervisor at Quikrete, decided in 2014 to expand recruitment efforts at Quikrete's Oklahoma City plant by advertising driver and other positions on a Spanish radio. In May 2014[5] he hired plaintiffs Manuel Lopez and Agustin Arriaga as truck drivers for Quikrete. He was aware that both individuals were Hispanic

---

[3]*Because defendant filed its motion for summary judgment before the court issued its decision on the motion for judgment on the pleadings, it includes arguments pertaining to plaintiffs' <u>Burk</u> tort and negligent supervision claims.*

[4]*Defendant's undisputed material facts will be referred to as "UMF # _".*

[5]*Although defendant's brief states that Arriaga was hired on May 5, 2016, the new hire form verifies that he was hired in 2014.*

when he hired them and believed that both were legally in the United States.[6]  When they were hired, Hodges explained the company had a 90 day probationary period for new employees[7] and that, after 90 days, new employees received a pay raise.  He provided both plaintiffs with copies of Quikrete's employee handbook, which included a section regarding the probationary period.[8]  It states: "During the probationary period – the first 90 days of employment – an employee has the chance to demonstrate adequate abilities and performance standards in order to be retained in his position . . . .Probationary employees can be dismissed without prior notice or obligation."  Doc. #71-11, p. 1.

All drivers are required to do pre-trip safety inspections, which include checking gauges and oil levels, including the hub oil in the axles, and to locate and replace burned out

---

[6]*Plaintiffs dispute this fact, UMF Nos. 16, 32, but the evidence they cite does not controvert it.  Plaintiffs tried to add a claim based on alienage, which the court did not allow because it was past the deadline for amending pleadings and past the discovery completion date.  See Doc. #72, p. 3. A question also existed as to its viability.  The discussion in the parties' briefs regarding immigration status is irrelevant to the issues before the court and has not been considered.*

[7]*Plaintiffs dispute this fact, stating that Hodges did not explain the probationary period in a manner in which they understood what he meant.  However, the only evidence they offer to controvert it is the deposition testimony of Arriaga in which he said, when asked if Hodges told him that the first three months was a probationary period for a new employee, "I don't remember if he told me that."  Doc. #80-1, p. 4.*

[8]*While plaintiffs dispute whether they could read or understand English well enough to read or comprehend the handbooks, they did not refute defendant's evidence that Hodges had explained the probationary period to them or offer evidence that controverted that "Hodges believed Arriaga and Lopez could understand English well enough to speak with him, drive a truck and read road signs or directions, and were capable of understanding the employee handbook and other documents."  Doc. #71, p. 9, UMF #11 (emphasis added).  Defendant notes in its reply brief that plaintiffs did not depose Hodges.  Doc. #81, p. 2.*

lights.[9]  UMF Nos. 2-3.  The trailers which Lopez and Arriaga drove had sight glass hub oil gauges on each outside trailer tire.  UMF #5.

Lopez

Hodges terminated Lopez on June 13, 2014, 17 days after he had hired him.  Lopez called Hodges early the morning of June 13 while on a delivery to Ada, Oklahoma and reported what Hodges recalled was a problem with the tires.[10]  Hodges sent out a tire mechanic who, he asserts, called and told him that the issue was not with the tires, but with the axle, which had sheared off because there was no hub oil.[11]  The tire mechanic left because he could not fix the problem and Hodges then arranged for another mechanic to

---

[9]*Plaintiffs do not dispute many of defendant's fact statements, but add comments to their response of "undisputed."  For example, in responding to defendant's UMF #2, which plaintiffs do not dispute, they state, "[h]owever, while drivers may be required to do pre-trip safety inspections, any complaints by the drivers are unheeded. Arriaga complained repeatedly to Hodges that the airbag system in his truck was defective, and had a leak. Hodges continued to make him drive the same truck despite not being able to find the leak, even after he himself heard the leak. Exhibit 1, Arriaga Deposition, 63:25, 64:1-4." Doc. #80, p. 13, ¶2. While that is not an appropriate response, see Fed.R.Civ.P. 56(c)(1), the evidence is undisputed that when Arriaga told Hodges that he thought there were problems with the air bags on the truck, Hodges not only told him to take the truck to get it fixed, UMF#4,  but "Hodges always told Arriaga to take the truck to Penske if Arriaga believe there was a problem [and], [i]f there was a problem with a truck that needed mechanical work, Penske would provide a temporary truck." UMF #45.  Arriaga took his truck to Penske at least once, but no problem with the air bags was found.  UMF#44.*

[10]*While plaintiffs assert that Lopez told Hodges the problem was more complicated than a tire issue and he still sent out a tire mechanic, the dispute is immaterial.*

[11]*Plaintiffs dispute this fact (UMF #20) on the basis that it is misleading and hearsay, yet the evidence offered to refute it does not controvert defendant's assertions regarding the substance of the telephone call between Hodges and the mechanic or the identification of the problem with the trailer.  Plaintiffs do not dispute UMF #22, which states essentially the same thing – that the second mechanic advised Hodges by telephone that the axle had sheared off because there was no hub oil lubricating the axle bearings.*

temporarily fix the axle so Lopez could drive the trailer back to the Oklahoma City plant. His freight was loaded onto a different truck and another driver completed the delivery. The second mechanic also told Hodges in a phone call that the axle had sheared off because there was no hub oil lubricating the axle bearings.

Hodges told Lopez to go to his office when he returned to the Oklahoma City plant. Hodges then inspected plaintiff's trailer and "saw that the axle was sheared off and had burn marks," which he "believed confirmed what the two mechanics had told him." Doc. #71, p. 11, UMF #23.[12] He then met with Lopez and asked him if he had checked the oil for the bearings in the axle and he told him he had not.[13] Doc. #71-2, p. 19. Lopez told Hodges that it was not his job to check the hub oil.[14] Lopez testified that Hodges then told him "it was [his] fault, it "was a stupid thing, therefore [he] was stupid, that [he] was stupid for what [he had] done." Doc. #80-2, p. 10. Based on the reports of the two mechanics and his own inspection of the trailer, Hodges testified he believed that Lopez was at fault for the incident. He terminated Lopez on the ground that he was still in his probationary period and had

_____

[12]*Although plaintiffs dispute this fact, they cite nothing to controvert it, so it is deemed admitted.*

[13]*Lopez gave confusing and conflicting testimony regarding his ability to check the crystal on the wheel that registered the oil level. He testified that he had previously checked it when he was in Woodward. See Doc. #71-2, p. 24. And he answered "No" to the question "And you never checked this to see if there was oil showing in this, in this sight glass on the trip to Ada, did you? Doc. #80-2, p. 19. However, Lopez relies on his statement "But if I could not see it," Doc. #80-2, p. 18, as demonstrating that he was not able to see the level of the oil. It does not matter, though, as Lopez admitted that he had not even attempted to check the oil level on the day he was discharged.*

[14]*Plaintiffs do not deny that Lopez made this statement to Hodges or offer any evidence to refute it.*

refused to take responsibility for his actions in the incident.

Arriaga

Hodges terminated Arriaga on June 24, 2014, seven weeks after he had hired him. On May 23, 2014, Arriaga received a traffic citation for an inoperative turn signal.[15] Hodges gave Arriaga a written warning for the violation on May 27, 2014, and advised him he could be terminated if he had another occurrence.

About a month later, on June 24, 2014, while Arriaga was pulling out of the gate at the Quikrete plant, he drove his truck off the gravel road into a ditch. He is the only Quikrete employee in Oklahoma City to have driven into that ditch. Arriaga was not looking at the road at the time, but was distracted[16] and was looking down. The reason as to why he was looking down is conflicting. Arriaga testified that his air brakes failed, while Hodges believed he was on his cell phone when he drove off the road. Hodges, while he was trying to get the truck out of the ditch, terminated Arriaga for unsafe driving, including not paying attention and being on his cell phone, and because he was still within the probationary

---

[15]*Plaintiffs dispute this fact, claiming it was an "unavoidable occurrence" because Arriaga did not realize his signal was out until he stopped at a weigh station. Doc. #80, pp. 17-18. Plaintiffs then state that "[w]hen he reported the ticket, Hodges forced Arriaga to sign an admission that the ticket was his fault and told Arriaga that if it happened again he would be terminated. This simply demonstrates the very basis of Plaintiffs' allegations. Defendant, by and through Hodges, treated Plaintiffs badly as he did all Hispanics." Id. at p. 18. However plaintiffs cite no evidence that non-Hispanics who received tickets were treated differently or provide any other substantiation for their statement. In their brief plaintiffs repeatedly make similar allegations of discriminatory conduct committed by defendant, yet fail to support it with admissible evidence.*

[16]*Plaintiffs dispute that he was distracted, asserting that he was "alarmed." Doc. #80, p. 18. However, Arriaga used the term distracted to describe himself. Doc. #71-5, p. 11 ("maybe that's when I got distracted").*

period. Hodges testified that if Arriaga had to use his brakes to turn onto the gravel road, then he was "going too fast and driving unsafe." Doc. #71-1, pp 10-11, ¶49. Another driver used Arriaga's tractor and trailer to complete his delivery on June 25, 2014, and did not report any brake problems.

Mark Collins, who is white, is another Quikrete driver supervised by Hodges. During his 90 day probationary period, Hodges gave Collins a warning for an overweight violation. Collins successfully completed his probationary period and since then has not been in a preventable accident or incident.[17] After his probationary period, Collins discovered a crack in the steel frame of his trailer, due to metal failure, which Quikrete asserts Collins could not have prevented.[18] He found the crack during an inspection and had it repaired before the trailer broke.

Plaintiffs include a statement of additional, controverted facts in their brief ("ACF_"). The court has considered these facts, to the extent they are relevant to, and discussed in conjunction with, plaintiff's claims, and are supported by admissible evidence. Many,

---

[17]Plaintiffs neither dispute nor admit these facts. Doc. #80, p. 21 (Response to UMF Nos. 50-52). Instead they state that "Collins has been disciplined for poor employee performance which would include maintenance of his truck," citing inadmissible hearsay (Doc. #80-3, p. 2, ¶25). They also make other assertions about Collins, which the court will discuss subsequently.

[18]This fact, too, [UMF #53] is "[d]isputed to the extent of establishing that Lopez and Arriaga's alleged vehicle damage was something under their control." Doc. #80, p. 21. Plaintiffs assert that Hodges cannot give an expert opinion as to the cause of the metal failure. Regardless, plaintiffs offer no evidence to show that Hodges did not believe, in good faith, that plaintiffs were responsible for the damage to their vehicle and Collins was not.

though, are irrelevant, supported by rank hearsay or consist of conclusory statements.[19]

Analysis

As plaintiffs have not offered direct evidence of discrimination, their claims are analyzed under the McDonnell Douglas[20] burden-shifting analysis. Barlow v. C.R. England, Inc., 703 F.3d 497, 505 (10th Cir. 2012). Under this framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* "If the plaintiff does not establish a prima facie case, his entire case fails." *Id.* If he does clear this initial hurdle, the burden shifts to the employer "'to articulate some legitimate, nondiscriminatory reason' for its action." Rivera v. City & Cty. of Denver, 365 F.3d 912, 920 (10th Cir. 2004) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). At this stage of the proceeding the defendant's burden is one of production, not persuasion. EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1191 (10th Cir.2000). If the defendant sustains its burden, "then summary judgment is warranted unless the employee can show

_____

[19]*For example, in ACF #5 (Doc. #80, p. 23), plaintiffs state that Hodges and/or Quikrete assigned better equipment to white workers than they assigned to Hispanic workers, citing the affidavit of Lopez, Doc. #80-3, ¶24. Lopez simply states in his affidavit that the equipment he was assigned was in worse shape than that assigned to white drivers, without identifying any driver or how their equipment differed. Defendant also offered uncontradicted evidence that Penske, not Quikrete, assigned the trucks to Quikrete's drivers. Doc. #71-1, pp. 2-3, ¶9. While, in his response to UMF #48, Lopez asserts that Edwin De Leon, a former Hispanic Quikrete driver, was assigned faulty equipment, he offers only hearsay evidence to support his assertion and it falls short of demonstrating that Quikrete assigned inferior equipment to Hispanics. Doc. #80-2, p. 2 ("He told me that he was fired because he missed one appointment because his tires were flat in the morning.").*

[20]*McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).*

8

there is a genuine issue of material fact as to whether the proffered reasons are pretextual." Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005). Despite the shifting burden of production "under the McDonnell Douglas framework, the ultimate burden of proving intentional discrimination is borne by the plaintiff." Horizon/CMS, 220 F.3d at 1191-92.

To establish a prima facie case of termination on the basis of national origin, plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for and satisfactorily performing the job; and (3) he was terminated under circumstances giving rise to an inference of discrimination. Barlow, 703 F.3d at 505. Here, defendant challenges the third element, arguing plaintiffs have not produced evidence linking their terminations to an inference of discrimination. Even if they could make it over that initial hurdle, defendant argues that they have no evidence of pretext. The court agrees on both grounds. The plaintiffs' claims will be considered separately.

Lopez

Defendant claims that Hodges terminated Lopez for the legitimate, non-discriminatory reason that, while he was still in the 90 day probationary period, Lopez failed to check the hub oil on his truck when driving to Ada, which caused the axle to shear off, and he did not take responsibility for the mistake. Lopez responds that he has evidence sufficient to give rise to an inference of discrimination. He claims Hodges "mocked his Hispanic workers for their lack of English fluency, flew off the handle, and cursed at them." Doc. #80, p. 28. He also asserts that on the day he was terminated, Hodges began to degrade and insult him, "[w]ithout verifying why the truck was having problems." *Id.* Finally, Arriaga argues that

a white employee, Mark Collins, was not terminated for a similar incident, but instead was given a new trailer.[21]

"[A]ctions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" can suffice to satisfy a plaintiff's *de minimus* prima facie burden. Plotke, 405 F.3d at 1101. Lopez asserts that Hodges mocked Hispanic workers for their difficulties with the language. When asked whether Hodges or the other white individuals who worked at Quikrete "only make fun of the Mexican people and Hispanic people," Arriaga responded: "I would say that he will laugh, but he will laugh about me." Doc. #80-1, p. 23. However, his testimony on this issue was, at best, equivocal. Arriaga also testified, when asked whether he ever saw Hodges laugh at him because of his understanding of English or how he spoke it: "No." Doc.71-5, p. 14. He then said, "But I think after the forklift [driver] told me that, after he talked to me, maybe he turned around and he started to laugh." *Id.* at pp. 14-15.[22] Arriaga later was unable to identify a time when Hodges had made fun of him. *Id*. at pp. 23-24. And both plaintiffs acknowledged that they never heard Hodges make any racially derogatory comments or statements about Hispanics.

It is doubtful this evidence, particularly since it pertained solely to Arriaga, would satisfy the third prong of Lopez's initial burden. However, Lopez also relies on Hodges'

---

[21]In its brief, Quikrete discusses several bases for plaintiffs' claims, which plaintiffs do not address in their response. See Doc. 71, pp. 19-20, 27. The court has only considered the arguments plaintiffs raise in their brief.

[22]Lopez testified that a forklift driver told him that Hodges said to him that he "needed to get better with [his] English." Doc. #71-5, p. 14.

behavior on the day of his termination to establish his prima facie case of race discrimination. He asserts that, after he returned to Quikrete with the truck, Hodges "flew off the handle," cursed at him,[23] and "began to degrade and insult" him.[24] Doc. #80, p. 28. While the court does not endorse that behavior, if it in fact occurred,[25] what Lopez has not shown is that Hodges' conduct stemmed from animus based on national origin, rather than anger because of damage to the truck. Lopez offers no evidence that Hodges' behavior on that date typified his treatment of Hispanics.[26] He does not assert that Hodges regularly referred to Hispanics, but not whites, as "stupid" or cursed only at nonwhites. He does, though, claim that at least once Hodges treated a white employee differently under similar circumstances. An inference of discriminatory motive can be based on "preferential treatment given to employees outside

---

[23]According to Lopez, the first thing Hodges said to him when he saw him was "you fucked up that trailer." Doc. #80-2, p. 9. He also allegedly told him "do you know how much it's going to cost to fix this shit?" Id. That is the extent of the cursing Lopez testified about. The only insulting language that Lopez testified to, as noted before, was: "He told me that it was my fault, that was a stupid thing, therefore I was stupid, that I was stupid for what I have done." Id. at p. 10. See Doc. #71-3, p. 12.

[24]Lopez also asserts in his brief that Hodges acted "[w]ithout verifying why the truck was having problems." Doc. #80, p. 28. That is a mischaracterization of the evidence. Before he spoke with Lopez, Hodges had been told by two mechanics that the axle had sheared off because of a lack of hub oil, UMF Nos. 20, 22, and had personally inspected the trailer and believed what he saw "confirmed what the two mechanics had told him." UMF #23. (While plaintiffs object to UMF #20 on the grounds of hearsay, they do not object to UMF #22).

[25]While the parties dispute what was said, that dispute does not preclude resolution of defendant's motion.

[26]In his affidavit Lopez makes several statements which the court concludes are conclusory or speculative or otherwise insufficient to demonstrate an inference of discrimination. See Doc. #80-3, p. 4 ¶¶49, 50, 57, 59 (E.G., "Quikrete has a reputation in the Hispanic community . . . .").

the protected class."   Plotke, 405 F.3d at 1101.

The incident Lopez relies on involved Mark Collins, a white driver, who had a broken trailer.  Lopez states in his brief that Hodges did not terminate Collins or "degrade and insult him."  Doc. #80, p. 29.  However, the only evidence Lopez cites to support his position that he and Collins were similarly situated is his own deposition testimony.  There he states:" I only remember Mark, he had some problems with his trailer. And what happened to Mark is that his trailer broke down and he put it aside and the next day they give him another trailer and he was working."  Doc. #80-2, p. 3.  This testimony is insufficient to create an inference of discrimination.  Further, Quikrete has offered uncontroverted evidence that the two situations were not comparable.

The two types of vehicle damage were different.  And not only did Collins discover the crack in his trailer before it caused any problem, he was not in his probationary period when he found it and had it repaired.  Lopez also does not discuss the conversation that took place between Hodges and Collins when the latter reported the damage to his truck and does not indicate he was present when it occurred so as to have personal knowledge of what transpired.  Also, when asked if he knew whether "Collins' trailer breaking down was similar to the accident or incident [he] had with [his] trailer going to Ada that caused [him] to stop," Lopez responded: "Those are different situations."  Doc. #71-2, p. 5.

The court concludes the evidence Lopez has offered is not enough to create an inference of discrimination with respect to Hodges' conduct towards Lopez, either on the day of the incident when he terminated him or during the brief 17 day period of his employment.

Lopez therefore has not met his burden of establishing a prima facie case of discrimination. Assuming he has, though, his discriminatory discharge claim would nonetheless fail, as his evidence fails to create a fact question regarding whether the reason Hodges/Quikrete gave for terminating him was pretextual.

Quikrete argues that it had a legitimate, nondiscriminatory reason for discharging Lopez – Hodges believed Lopez failed to comply with his duty to check the hub oil, that caused the axle to shear off, Lopez was still in his probationary period and he failed to take responsibility for the incident.[27]  Lopez contends he has evidence of pretext, which can be established "by showing the defendant's proffered non-discriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"  Johnson v. Weld Cty., 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1197 (10th Cir.2008)).  His asserted evidence consists of his proof that he was unable to see the sight glass for the hub oil and that "Hodges flew off the handle and terminated him, even though a similar instance with a 'white' employee ended very differently with Collins receiving no reprimand and a new trailer."  Doc. #80, p. 30.

Even if Lopez could not see the sight glass,[28] that does not demonstrate or create a question as to whether Hodges "didn't really believe [his] proffered reasons for [terminating

---

[27]*Plaintiffs do not assert that defendant failed to meet its burden of proffering a legitimate reason for its employment decision with respect to either termination.*

[28]*The evidence was unclear as to this point.  See supra note 13.*

13

Lopez] and thus may have been pursuing a hidden discriminatory agenda." Johnson, 594

F.3d at 1211. "[A] challenge of pretext requires us to look at the facts as they appear to the

person making the decision to terminate plaintiff." Kendrick v. Penske Transp. Servs., Inc.,

220 F.3d 1220, 1231 (10th Cir. 2000). The court's role in this situation is not "to ask

whether the employer's decision was 'wise, fair or correct, but whether [it] honestly believed

[the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith

on those beliefs.'" Johnson, 594 F.3d at 1211 (quoting Rivera, 365 F.3d at 925).

Lopez has presented nothing to challenge defendant's evidence that Hodges had a

good faith belief that Lopez was supposed to check the oil, did not do it for whatever reason,

and that, because of a lack of oil, the axle sheared. A jury could not find otherwise when it

is undisputed that drivers are supposed to check the hub oil in their pre-trip safety

inspections, Lopez told Hodges he did not check the oil that morning, though he had done

it on at least one other trip, a mechanic told Hodges that the axle sheared off because of a

lack of hub oil, and Hodges' own inspection of the trailer indicated the axle sheared because

there was no oil.

Lopez also has offered no evidence demonstrating that Hodges knew Lopez may not

have understood he was a probationary employee. And Lopez does not claim he accepted

responsibility for the incident during the meeting in Hodges' office.

The other bases Lopez urges to suggest pretext – Hodges' alleged mocking of

Hispanic workers for their lack of English fluency, his behavior towards Lopez during the

meeting when he terminated him, and the incident involving Collins – are insufficient to

create a question of fact for the jury. For the same reasons that evidence is insufficient to demonstrate a prima facie case, it is insufficient to show pretext. This conclusion is bolstered by the inference to which Hodges is entitled because Lopez "was hired and fired by the same person within a relatively short time span." Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006). When that occurs, "there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.'" *Id*. (quoting Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991).[29] Hodges both hired and fired Lopez within 17 days. Lopez has not rebutted the strong inference that his national origin was not the motivation for Hodges's decision to terminate him.

As the court concludes Lopez neither established his prima facie case of discriminatory discharge nor provided evidence sufficient to raise a triable issue regarding pretext, Quikrete is entitled to summary judgment on Lopez's Title VII claim of discriminatory discharge. Quikrete also is entitled to summary judgment on his discriminatory discharge claim asserted under the OADA,[30] as that claim is analyzed under the same standards as his claim under Title VII. *See* Barzellone v. City of Tulsa, 210 F.3d 389, at *5 (10th Cir. 2000); Cunningham v. Skilled Trade Servs., Inc., 2015 WL 6442826,

---

[29]*The "same actor" evidence "gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions,"* Antonio, *458 F.3d at 1183, which can be rebutted. Here, though, plaintiff failed to present countervailing evidence of pretext.*

[30]*The OADA makes it a discriminatory practice for an employer to "[t]o fail or refuse to hire, to discharge, or otherwise to discriminate against an individual with respect to compensation or the terms, conditions, privileges or responsibilities of employment, because of race, color, religion, sex, national origin, age, genetic information or disability[.]" 25 Okla. Stat. § 1302(A)(1).*

at *3 (W.D. Okla. Oct. 23, 2015).

Arriaga

Hodges terminated Arriaga after he drove his truck partially into a ditch a month after Hodges had given him a written warning for receiving a traffic violation. Arriaga was still within the 90 day probationary period at the time he was fired. Hodges testified that he believed Arriaga told him he was not paying attention and that Arriaga or another driver may have told him Arriaga was on his cell phone at the time of the accident. He claims he believed Arriaga was driving carelessly. Quikrete asserts that Arriaga's proof also is insufficient to establish either a prima facie case or to suggest that Hodges did not honestly believe the reasons he gave for terminating him. Again the court agrees.

Arriaga asserts that "both the way he was treated during his employment[31] and the circumstances of his termination give rise to an inference of discrimination." Doc. #80, p.

---

[31]*Arriaga does not discuss or cite any evidence in the argument section of his brief pertaining to his treatment while he was employed, other than not being allowed to explain what happened when he drove into the ditch. In his response to UMF #33, Arriaga intimates he was treated badly when "forced' to sign an admission that the ticket he had received was his fault and was told that if he received another ticket he would be fired. Doc. #80, p. 18. However Arriaga offers no evidence that other employees were treated differently. Hodges gave Collins a warning for an overweight violation during his probationary period , UMF #50, and Hodges testified that Collins was warned he could be terminated for another violation. Doc. #71-1, p. 6, ¶30. In their statement of additional controverted facts, Arriaga states that he was forced to drive on a bad tire, and that this was an example of how "Quikrete treated Hispanics badly, knowing they would not report for fear of retaliation." Doc. #80, p. 23, ACF#1. Arriaga said he called Hodges one day when he was traveling to Amarillo and told him he had a flat. He said when he told Hodges that he had 20 miles left, he was instructed to "keep going like that," even though if he had received another traffic violation, "he would have fired me." Doc. #80-1, p. 17. Hodges testified that it is not uncommon for drivers, if they get a flat tire, to drive several more miles until they can "stop at an appropriate location and time to get the tire repaired or replaced." Doc. #71-1, pp. 12-13, ¶58. Regardless, Arriaga offers no evidence that non-Hispanics were treated differently when they had flat tires.*

16

29.  He then cites two pages from his deposition testimony (Doc. #80-1, pp. 19-20),  where he discusses the accident, stating that the brakes did not work because he needed more air and, after it happened, he was not allowed to explain anything.  The fact that Arriaga was fired without being permitted to explain why, alone, does not demonstrate that he was terminated because of his national origin.  He drove his truck into a ditch while he was still in his probationary period and after he had received a traffic citation and been warned that if he had another occurrence he could be terminated.  He admitted that he "looked down, and when I looked up, I was on my way to the ditch."  Doc. #71-5, p. 7.  In the absence of other evidence that permits an inference of discrimination in his dismissal, for example that nonwhites were treated differently in similar circumstances, i.e., that they were allowed to explain what happened when involved in an accident, the court concludes Arriaga has not met his *de minimis* prima facie burden.  Even if he had, his claim would not make it past the next hurdle of showing that there is a dispute regarding the sincerity of Quikrete's proffered reason for his termination. *See* <u>Rivera</u>, 365 F.3d at 924.

As evidence of pretext, Arriaga asserts that "Hodges repeatedly ignored his complaints regarding his truck and then railroaded him when the complaints came to fruition."  Doc. #80, p. 30.[32]  Arriaga testified that his air brakes failed and that he had previously complained to Hodges about a leak in the air system of his truck.  He contends

---

[32]*While plaintiffs claim "[t]his was the pattern and practice of Quikrete.  To treat its Hispanic employees deplorably and fire them with fabricated reasons," Doc. #80, p. 30, they offer no credible, admissible evidence to substantiate their assertion.*

there is one interconnected air system in the truck – that the air bags and air brakes are connected. *See* Doc. #80-1, pp. 7-8. Quikrete acknowledges that Arriaga had previously reported a problem with his air bags, but it is undisputed that Hodges told him, like the other drivers, that it was his responsibility to get it fixed and that Arriaga had taken the truck to Penske but the leak could not be located. *See* supra note 9. Defendant claims Arriaga did not report any problems with his brakes on June 24, 2014, on his pre-trip inspection form, and that if there had been problems with the air brakes on the truck, they would not have disengaged and he could not have operated the truck. The court does not, though, have to determine whether the two air systems are interrelated or, if the brakes failed, and that is what caused Arriaga to become distracted. The issue is whether Hodges honestly believed the reasons he gave for terminating Arriaga, even if the reasons may later have turned out to be wrong. *See* Rivera, 365 F.3d at 924-25.

Examining the facts as they appeared to Hodges, as the court is required to do, *see id.*, Arriaga was going too fast, regardless of whether it was because he was driving too fast or his breaks had failed. No other employee had ever driven into that ditch. He was still within the probationary period and had been warned that, if he was involved in another occurrence, he could be terminated. Arriaga does not argue or offer credible evidence that nonwhites were routinely fired by Hodges without being allowed to tell their side of the story. Whether he should have been allowed to explain what happened is not for this court to decide. What the court does have to decide is whether Hodges' decision that Arriaga was going too fast to make the turn and because of his careless driving drove into the ditch was pretextual. In the

court's view, a reasonable jury could not reach that conclusion on the basis of the evidence in this record. Once again, the court's decision is supported by the "same actor inference," as Hodges was the same person who, within a brief period of time – seven weeks – both hired and fired him. *See* <u>Antonio</u>, 458 F.3d at 1183.

Arriaga has failed to demonstrate either a prima facie case of national origin discrimination or establish a genuine issue of material fact as to whether Hodges's proffered reason for terminating his employment was pretextual. Quikrete is therefore entitled to summary judgment on both his Title VII and OADA discriminatory discharge claims.

For the reasons stated, the court concludes Quikrete is entitled to summary judgment on both plaintiffs' claims for discriminatory discharge. Accordingly, Quikrete's motion for summary judgment [Doc. #71] is granted.[33]

**IT IS SO ORDERED**.

Dated this 13th day of December, 2016.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE

---

[33]*Plaintiffs assert that they would have had additional information to support their claims if the court had ordered the discovery they requested. They detail in the Procedural History segment of their brief the alleged errors committed by opposing counsel and the court in conjunction with discovery. The problems plaintiffs encountered in obtaining the information they sought was due to their failure to follow the Federal Rules of Civil Procedure in the discovery process and their failure to make timely discovery requests.*